USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/1/12_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ROBERT WILLIAMS,                                     :
                                                     :   REPORT AND
                        Petitioner,                  :   RECOMMENDATION
                                                     :
        -v-                                          :   11 Civ. 2504 (PGG) (JLC)
                                                     :
J.B. LEMPKE,                                         :
                                                     :
                        Respondent.                  :
-------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Paul G. Gardephe, United States District Judge:**

Pro se Petitioner Robert Williams ("Williams") has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his June 24, 2008 conviction by a jury in New York Supreme Court, New York County. Williams was convicted of two counts each of attempted murder in the first degree, rape in the first degree, robbery in the first degree, burglary in the first degree, and attempted assault in the first degree; one count each of kidnapping in the first degree, arson in the second degree, and assault in the second degree; five counts of assault in the first degree; eight counts of criminal sexual act in the first degree; and twelve counts of predatory sexual assault. The trial court found Williams to be a second violent offender and sentenced him to an aggregate prison term of 422 years to life, which he is currently serving at Five Points Correctional Facility in Romulus, New York.

On March 30, 2011, after exhausting his rights to appeal in state court, Williams filed a habeas corpus petition in this Court. In his petition, Williams asserts three grounds for relief: (1) the trial court's decision to restrain him in shackles during the trial violated his federal due process and Sixth Amendment rights; (2) the evidence presented at trial was legally insufficient to convict for attempted first-degree murder under the two theories charged by the prosecution;

1

USDC SDNY
DATE SCANNED_ 6/1/12_

and (3) the conviction for assault by medication was duplicitous and unsupported by the evidence. On August 1, 2011, the Hon. Paul G. Gardephe referred this matter to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the reasons set forth below, I recommend that the petition be DENIED.

## I.   BACKGROUND

The following facts are drawn from the record of proceedings before the state trial and appellate courts. In view of Williams' conviction, the evidence presented at trial is summarized in the light most favorable to the verdict. Garbutt v. Conway, 668 F.3d 79, 80 (2d Cir. 2012).

### A.   The Facts Leading Up to Williams' Arrest

On April 13, 2007, Jaime Roth ("Roth"), a resident of 19 Hamilton Terrace in Hamilton Heights, Manhattan, returned home at around 9:00 p.m. and encountered Williams outside her apartment building. (Trial Transcript ("Tr.") 87-88, 347-48). Roth, who was with a co-worker, Celeste DeCamps ("DeCamps"), opened the front door and Williams pushed his way into the building and entered the lobby with Roth and DeCamps. (Tr. 88-90, 363-64). Williams did not push the button for the elevator or get on the elevator when it arrived. (Tr. 89-96, 352-58). DeCamps and Roth rode up to Roth's apartment alone and did not see Williams again that night. (Tr. 89-96, 352-61). Whitney Hawthorne ("Hawthorne"), another resident of 19 Hamilton Terrace, also returned home around 9:00 p.m. and saw Williams in the lobby. (Tr. 645-47). Williams entered the elevator with Hawthorne and told her that he was visiting "Evans." (Tr. 652-56). Hawthorne didn't know anybody by that name but told Williams that "Evans" was on the fourth floor because she felt uncomfortable being in the elevator alone with him. (Tr. 652-56). When the elevator stopped at the fourth floor, Hawthorne insisted that Williams get out of the elevator, which he did. (Tr. 656).

The victim in this case, a graduate student at Columbia University, left school around 9:30 p.m. to return home to her one-bedroom apartment on the fifth floor of 19 Hamilton Terrace. (Tr. 390-91, 395, 417).[1]  She encountered Williams when she entered the elevator on the ground floor of the building. (Tr. 420-21).  Williams pushed the button for the sixth floor but exited when the elevator stopped on the fifth floor and followed the victim down the hallway to her apartment. (Tr. 421-22).  When the victim entered her apartment and turned to shut the door, Williams was in her doorway, saying "Miss Evans, Miss Evans." (Tr. 422-23).  The victim told Williams that he must have the wrong apartment and attempted to close the door but Williams forced his way in, knocked the victim's cell phone out of her hand, and grabbed her in a chokehold, stifling her screams. (Tr. 423-26).  Williams then dragged the victim into her bedroom where he tore off her clothing and began repeatedly to rape her, both vaginally and anally, and force his penis into her mouth. (Tr. 426-33).  He paused his sexual attack only briefly in an attempt to watch pornography on the victim's television but, after learning that she did not have access to any pornography channels, brought the victim back into the bedroom and continued to force her to perform oral sex "[f]or a long time." (Tr. 433-37).

At some point, Williams took the victim into the bathroom and forced her to perform oral sex on him in the bathtub, which he had filled with water, telling her "it's not too big for you, suck my little dick, all the way down, all the way down." (Tr. 437-38, 444-45).  The victim gagged and vomited into the bathtub, but Williams did not stop. (Tr. 444-45).  After a while, Williams got out of the bathtub and looked in the victim's medicine cabinet, where the victim kept non-prescription medication such as Tylenol and ibuprofen.  Williams took a handful of pills and made the victim swallow them. (Tr. 445-47).  Then he brought the victim back to her

---

[1]       In light of New York Civil Rights Law § 50-b, and consistent with Judge Gardephe's sealing order dated June 17, 2011 (Dkt. No. 7), I will not refer to the victim by her name in this Report and Recommendation.

bedroom and continued to force her to perform oral sex.  (Tr. 447-48).  Angry that her wet hair

from the bathtub was getting in his way, Williams found a pair of scissors and demanded that the

victim cut her hair.  (Tr. 448).  She did so.  Then Williams forced his penis back into the victim's

mouth for "a long time" until the victim vomited again, all over the sheets.  (Tr. 452-53).

Williams turned the mattress over and continued to rape and sexually assault the victim.  (Tr.

453).

      Finally, Williams stopped and began to rifle through the victim's belongings.  (Tr. 453-

56).  He pulled her iPod out of a shoulder bag, took cash and cards from her wallet, and looked

through her mail, books, jewelry, and clothing, placing some of the victim's belongings in a

backpack he found in her closet.  (Tr. 455-61, 470).  While he did so, Williams asked the victim

a series of questions:  whether she was running from the law, if she had ever been arrested, if she

"ran" with the 148th Street gang, who she worked for, if her daddy "did" things to her, whether

she had ever testified against anyone, if others had keys to her apartment, and whether she

expected anybody to come to her apartment the next day.  (Tr. 470-74).  Williams then went into

the kitchen, searched through the cabinets, drawers, and refrigerator, threw two small knives into

the garbage, and picked up a large knife.  (Tr. 465-66).  He found a microwavable dinner in the

freezer and forced the still-naked victim to cook it for him and make him a cup of tea.  (Tr. 468-

69).  When it was ready, he brought the food, the victim, and a fistful of non-prescription pills

back to the bedroom, where he shoved the pills into the victim's mouth and forced her to wash

them down with four bottles of beer he had taken from her refrigerator.  (Tr. 472-77).

      Then Williams raped the victim again.  The victim grabbed the scissors, which were still

on her bed, and unsuccessfully tried to stab Williams in the neck, but Williams threw the victim

into a corner and stood over her with the scissors.  (Tr. 477-78).  The victim began to sob and

screamed "you're going to kill me, you're going to kill me."  Williams said "shut up, I'm not going to kill you" and raped the victim again.  (Tr. 478-79, 483-85).

It was light outside at this point.  (Tr. 500).  Williams took a tube of crazy glue and spread glue over the victim's lips so that she could not open her mouth.  (Tr. 496).  He brought the victim into the bathroom, placed another handful of pills, one by one, into a small opening in the victim's glued mouth, and forced her to swallow them with water from the shower.  (Tr. 486-88).  Then Williams blindfolded the victim, tied her ankles and wrists together, wrapped duct tape around her mouth, and dragged her to the closet where he suspended her from a clothing rod so that only her toes touched the floor.  (Tr. 496-501).  The victim hung there painfully for a long time as she listened to Williams moving around the apartment, the sound of spray bottles, and what sounded like something sliding around the floor.  (Tr. 505-10).  At some point, Williams removed the victim from the closet, but then brought her back to the closet.  (Tr. 508).  Eventually, Williams took the victim from the closet and dragged her back to the bedroom where he removed the blindfold and tossed clear liquid from a pan into her face.  The victim's face and shoulders began to burn and she realized the liquid was bleach.  (Tr. 510-12).  Williams told the victim to open her eyes, asking "can you see?"  When she opened her eyes, he threw the rest of the bleach at her face.  (Tr. 510).  The victim's eyes were not damaged, but thereafter she pretended that she couldn't see so that Williams would not throw more bleach at her.  (Tr. 512-14).

Williams then removed the tape from the victim's mouth and asked what he should do with her.  (Tr. 515-19).  The victim had the impression that it was late morning but did not know for certain because Williams had moved her clock and removed her watch from her wrist.  (Tr. 524, 428).  Williams asked the victim how he could get money using her two ATM cards and whether he could trust her to accompany him to get her car in Connecticut.  (Tr. 519-20).  The

victim told Williams that he could trust her and gave him her PIN numbers and the locations of two nearby ATM machines.  (Tr. 520-21).  Williams left the apartment but returned fifteen minutes later, angry because he had been unable to obtain any money.  (Tr. 519-25).  Williams dragged the victim to the bathroom, yelling that she had "disrespected" him, and ordered her to gouge her eyes out with the scissors.  (Tr. 526-28).  Williams placed the scissors between the victim's knees and pressed her knees closed so that the blades of the scissors faced towards her and indicated that the victim should force her eyes toward the blades of the scissors.  (Tr. 529).  When the victim cried and refused to do so, Williams took the scissors and disappeared into the kitchen.

A few minutes later, the victim heard the tea kettle whistle in the kitchen and Williams came back into the bathroom with a large red bucket and dumped boiling water on the victim, asking again why she had "disrespected" him.  (Tr. 529-30).  The victim was in "searing, unbelievable pain, like nothing [she'd] ever experienced."  (Tr. 531).  She begged Williams to turn on the cold water and pleaded with him to "just kill me."  Williams responded that she was not good enough for that and asked "are you going to stab your eyes out now?"  (Tr. 530-32).  This time, the victim said she would and Williams propped the scissors up in a pile of clothing on the floor with the blades facing up.  The victim decided to aim for her neck because "if I died, it would be quicker than however he was going to do it."  (Tr. 532).  But when she lunged down, the scissors glanced off of her neck.  Williams became even angrier and said "I told you to stab yourself in the eyes" and threw her against the wall.  (Tr. 532).  He went away and came back and struck the victim in the head with "something really heavy," then picked it up and hit her again.  (Tr. 533-34).  The victim couldn't see straight; everything was blurry and she was dizzy and "bleeding all over."  (Tr. 533).  Williams came back again with the red bucket and poured more boiling water on the victim.  (Tr. 538-40).

Williams then showered and dressed the victim, tied her to a futon with Ethernet cables, and dumped the remainder of a bottle of extra-strength Tylenol into her mouth.  (Tr. 540-48).  The pills overflowed from the victim's mouth and she gagged as some of the pills came out of her mouth and fell on the floor.  Williams picked up the pills and placed them back in her mouth, one by one.  (Tr. 548).  When she had swallowed all of the pills, Williams asked again for the victim's ATM PIN numbers and left the apartment.  (Tr. 548-49).  He returned shortly, furious again because he had been unable to withdraw any money.  (Tr. 549-50).  Williams stuffed a sock in the victim's mouth and wrapped her face with clothing, creating a large mound that came up over her nose.  (Tr. 550-51).  He went back to the kitchen, came back with the large knife and began slashing at the victim's eyes in deep straight cuts across her eyelids and beating her eye sockets with the blunt end of the knife.  The victim could see blood running down the sides of her eyes and it looked like "chunks of something" coming over her eyelids.  (Tr. 551-52).  Williams said "[y]ou wanted to die, right?" and put a blanket over her head.  The victim screamed then and lost consciousness.  (Tr. 553).

When the victim awoke, she did not hear Williams but smelled smoke coming from behind the futon and realized that her apartment was on fire.  (Tr. 554-58).  Using the heat from the fire, she was able to melt the Ethernet cables securing her to the futon.  (Tr. 559-62).  The fire was spreading fast and there was thick black smoke everywhere and "everything was going up in flames."  (Tr. 563).  The victim ran out of her apartment and found another resident of the building, Steve Guellermo ("Guellermo"), who called 911 and took her to the superintendant of the building, Carl Peroune ("Peroune").  (Tr. 629-35).

**B.  Williams' Arrest**

Firefighters, police, and emergency medical technicians responded to the building shortly afterward.  (Tr. 567-68).  Officer Joe Lessard ("Lessard") of the New York City Police

Department, who arrived at the scene shortly before 5:00 p.m., was among the first to respond.

(Tr. 682-85, 701). Lessard spoke with the victim, who described her attacker as a black male,

approximately thirty years old, six feet tall and 180 lbs., with a bald head, goatee, gold tooth, and

several distinctive scars on his stomach, chest, and arm. (Tr. 568-70, 691-93). This description

was broadcast to other officers on patrol. (Tr. 693-94). The victim was then taken to the

emergency room in critical condition and immediately treated with morphine and antibiotics.

(Tr. 165, 1089-90, 1095, 1099). She had first and second degree burns over thirty percent of her

body and was exhibiting symptoms of impending liver failure from Tylenol overdose. (Tr. 148-

54, 161, 1072-74, 1078-85, 1094-95, 1090-91, 1098, 1482). Doctors opined that if the victim

had gone untreated for much longer, she would have been at a "significant risk of death." (Tr.

155, 1099, 1480).

After the fire was put out, Detective Robert Billella ("Billella") and other members of the

NYPD's Crime Scene Unit dusted the victim's apartment for fingerprints, took swabs for DNA

testing, and recovered bedding, clothing, a pair of scissors, human hair, a blood-stained

comforter, the victim's melted cell phone, and numerous other items of physical evidence, all of

which were later introduced into evidence at trial. (Tr. 171-77, 281-93). Fire Marshal Michael

Farrell ("Farrell") inspected the apartment and determined the fire to be non-accidental based on

the distance between its starting point and any potential source of combustion, the lack of

damage around the nearest electrical outlets, and the absence of any indicated natural cause. (Tr.

1224-26, 1235, 1244-46, 1251-55, 1262). Detective Kenneth Fiol ("Fiol") visited the victim at

the hospital and obtained a description of her attacker consistent with the one obtained by

Lessard. (Tr. 1274). Fiol also interviewed and obtained similar descriptions from Roth,

DeCamps, and Hawthorne. (Tr. 1277-78).

On April 19, 2007, Williams was arrested in Queens on unrelated burglary charges.  (Tr. 1165-68; Supp. Tr. 28).  At the time of his arrest, Williams was wearing a shirt with the victim's blood on it.  (Tr. 1177-78, 1305-07, 1533-36, 1545).  Police Officer Carmine Bellamore ("Bellamore") processed Williams' arrest in Queens and recovered from him a pair of headphones belonging to the victim.  (Tr. 1166-72).  That evening, Williams was identified in a line up by both DeCamps and Roth as the man they had seen in the lobby on the evening of the attack.  (Tr. 111-12, 372, 1178-79, 1312-29).  The victim also identified Williams in a lineup after she was released from the hospital.  (Tr. 620-23, 1373-88).

**C.  Pre-trial Proceedings**

On May 17, 2007, a grand jury indicted Williams on two counts each of attempted first-degree murder, first-degree burglary, first-degree robbery, and sexual abuse in the first degree; one count each of first-degree kidnapping and second-degree arson; nine counts of first-degree assault; five counts of first-degree rape; twelve counts of first-degree criminal sexual act; and thirty-four counts of predatory sexual assault.  (Respondent's Answer Opposing Petition for Writ of Habeas Corpus, filed under seal on July 1, 2011 ("Answer") ¶ 4 (Dkt. No. 8)).[2]  Williams pleaded not guilty to the charges and was detained by the New York City Department of Corrections pending trial.  (See Suppression Hearing and Voir Dire Transcript ("Supp. Tr.") 59, 71, 186, 190, 252, 320-22).

On April 20, 2007, Detective Fiol visited Williams in a holding cell in the District Attorney's Office with a search warrant for Williams' gold tooth.  Williams told Fiol that the tooth was not removable, then asked to be taken to the bathroom.  A few moments later, Fiol saw Williams spit into toilet, "heard a cling and some water splashed," and the gold tooth was "no

---

[2]     Pursuant to Judge Gardephe's June 17, 2011 Order, Respondent has filed all of its papers under seal in order to protect the identity of the victim in this case.

longer there."  Fiol and his colleagues were unable to recover Williams' gold tooth from the toilet.  (Supp. Tr. 54-57, Tr. 1359-61).

In late May 2007, the day before Williams was scheduled to be produced for a lineup, corrections officers discovered a wrapped razor blade in his rectum and a battery in his digestive tract, resulting in his emergency transfer to Bellevue Hospital and postponement of the lineup. (C.P.L. § 730 Hearing Transcript ("730 Tr.") 69-70, 95-97, 195-97, 267-69, 300, 478).  The State's psychiatrists later conjectured that Williams had purposefully swallowed the razor blades and battery in order to avoid appearing at the lineup.  (730 Tr. 69-70, 194-95).  In pre-trial proceedings before the court, Williams explained the presence of the razor blade on the basis that he had "been in the system several times" and was "assaulted over a couple of times" and didn't like being "stuck and stab and cut."  (Supp. Tr. 72).  After this incident, the Department of Corrections required that Williams be produced for pre-trial court appearances in restraints. (Supp. Tr. 167).

From March 27 until April 3, 2008, Supreme Court Justice Carol Berkman heard evidence to determine Williams' fitness to stand trial under New York Criminal Procedure Law Section 730.  In the course of those proceedings, she received extensive documentary and testimonial evidence chronicling Williams' long history of violence and aggression, both in and out of custody.   Williams' criminal record began at age thirteen and continued virtually uninterrupted until his arrest on this case.  (730 Tr. 5-529).  The record showed that, between 1994 and 1995, while in the custody of the Division of Youth for assaulting a fellow high school student, Williams repeatedly fought other offenders and assaulted staff, accruing more than 70 disciplinary violations.  (730 Tr. 188).  The Division eventually concluded that Williams "was not manageable" in juvenile custody and transferred him to the adult custody of the Department of Correctional Services.  (730 Tr. 188-89).  In 1996, after his release, Williams shot a man twice

in the back, pled guilty to attempted murder, and was sentenced to four to eight years in prison. (730 Tr. 188).  In 1997 and 1998, while serving his sentence on that charge, Williams assaulted another inmate with a sharp object, causing his victim to require 47 stitches and, on a separate occasion, attacked another inmate with a "five inch metal shank."  (Supp. Tr. 214-15).  In 1999, Williams attacked and injured another inmate, attacked a corrections officer, exposed his genitals to a nurse, and was found with a razor blade concealed on his meal tray.  (Supp. Tr. 213-14).  In 2001, Williams tried to incite another inmate to "cut" a corrections officer.  (Supp. Tr. 213).  In 2003, Williams threw an unknown liquid in the face of a corrections officer, exposed himself to a nurse, and made more threats.  (Supp. Tr. 213).  All in all, "Williams had so many [disciplinary] violations, had fought so much, [and] resisted so much" that he lost nearly all of his good time credit and was eventually transferred to the Special Housing Unit of the Department of Corrections.  (730 Tr. 199).

Williams' record of combative, violent behavior was not confined to a disciplinary setting.  During a brief psychiatric hospitalization, Williams was "very violent with staff and also with other patients" and ultimately given antipsychotic medications merely to "manage uncooperative and potentially violent behavior."  (730 Tr. 39, 202-03).  Following his release from prison in 2006, Williams knocked a passenger to the ground on a subway platform, breaking the man's wrist, and spent four months in jail for third-degree assault.  (Supp. Tr. 211). In short, the recurring theme of Williams' competency hearing was his life-long propensity for extreme violence, "impulsive, uncontrollable" conduct, and "resistance to authority figures." (730 Tr. 315).  The psychiatric experts attributed his variously "bizarre, disorganized, uncooperative [and] out of control" behaviors to antisocial personality disorder but disagreed as to whether he also suffered from psychosis that would render him unfit to stand trial.  (730 Tr. 41, 183).  On April 8, 2008, after hearing extensive psychiatric testimony in conjunction with

thousands of pages of Williams' medical, psychiatric, criminal, educational, and disciplinary records, the court concluded that Williams was fit to stand trial and scheduled jury selection for late May.  (730 Tr. 609-10).

On May 27, 2008, Williams was scheduled to appear again before the court for pre-trial proceedings but initially refused to change out of his prison garb, delaying the proceedings. (Supp. Tr. 68).  During the proceedings, Williams personally interposed objections to the testimony of the State's primary witness.  (Supp. Tr. 30-31).  A few moments later, the court asked: "[w]hat seems to be the problem, Mr. Williams?"  Williams responded: "[m]ind removing your arm from behind my chair," apparently referring to court officers.  (Supp. Tr. 33).

Later during the hearing, the State made an application to restrain Williams at trial pursuant to Deck v. Missouri, 544 U.S. 622 (2005).  The State explained that restraints at trial were appropriate due to the extreme nature of the charges, Williams' lengthy violent record, and ongoing disruptive behavior before the court, including that very day.  Williams opposed the application.  (Supp. Tr. 165-172).  After hearing from both sides, the court took the matter under submission.  It noted that Williams' "corrections history . . . and his history with regard to this case, the razor blade, . . . all do seem to support unusual restraint," but emphasized that "[c]ertainly it's important to me that . . . we have a presentation which doesn't show him in shackles."  (Supp. Tr. 172.)

Two days later, Williams again refused to leave his cell to appear in court.  (Supp. Tr. 174).  In considering whether to proceed in his absence, the court explained that she had advised Williams two days earlier that she would proceed in his absence since "I foresee this happening each time we convene," but called a recess and issued a force order for his production by the Department of Corrections.  (Supp. Tr. 172, 185).  At the afternoon session, Williams appeared and had the following colloquy with the court.

THE COURT:  Well, Mr. Williams, on Tuesday we had a little chat about your right to be present in court and how it's your constitutional right.  But what I'm told, sir, is that there were a number of visits made to your cell today starting at or about five o'clock or so and you refused to come out.  Is that correct, sir?

WILLIAMS:  Yes. . . .  I was kind of fatigued there.

THE COURT:  You were kind of fatigued?

WILLIAMS:  Yes.

THE COURT:  I see.  Now I see, Mr. Williams, I told you the other day, sir, that if you didn't come out voluntarily, I wasn't going to produce you by force so I guess I wasn't correct entirely because I wanted to be entirely clear here on this subject.  What I'm going to do is, I'm going to ask Corrections to come to your cell each day that the trial is in process and ask you please to come out, would you please, and if you say no, I don't feel like it.  I will not wait.  Do you understand me, sir?

WILLIAMS:  Yes.

THE COURT:  I will just go on with whatever we're doing without you. . . . Do you understand me?

WILLIAMS:  Yes.

THE COURT:  So I'm not quite understanding you, Mr. Williams, because you didn't really tell me whether you wanted to be present or not and you're still not telling me whether you want to be present.  It is your constitutional right you know.  So what is it that you want?

WILLIAMS:  I actually want to be present.

THE COURT:  I'm sorry, sir, you would want?

WILLIAMS: I said I actually want to be present for some of the hearings that should be appropriate to me or some of the hearings that you probably don't want me here.

THE COURT:  Mr. Williams, it's not a question of whether I want you here or I don't want you here.  You have an absolute constitutional right to be present.  That's why a whole bunch of corrections officers spent a long time trying to coax you out from under your bed all morning long and that's why all of us; your lawyer, . . . the prosecutors, myself sat around all morning long so I'm telling you, Mr. Williams, I was a little fatigue[d] myself this morning, that's really too bad.  I'm telling you right now, corrections officers will come around to your cell like anybody else and say time to get up and go to court.  You're not on the early trial bus, Mr. Williams, after

13

today, that's because you don't want to be and I'm proceeding without you.
Do you understand me?

WILLIAMS:  Yes, I do, Judge.

(Supp. Tr. 185-88).

The court also announced at this hearing that it would grant the State's application for a

shackling order.  Justice Berkman explained that her ruling was based, in large part, on

Williams' especially violent record in the State prison system.  (Supp. Tr. 188-95).  In addition,

the court had learned "that there had been assaultive behavior by Mr. Williams on a correction

officer when he came back from court on Tuesday . . . [and] that Mr. Williams' records at

Riker's and his current incarceration includes a number of assaultive behavior[s] including the

throwing of feces and other behavior."  (Supp. Tr. 190-91).  These considerations, in conjunction

with "the fact that we have this ongoing resistive behavior to the process of this trial . . . and that

it would appear that the defendant is interested in derailing this trial by way of any means

necessary[,]" caused the court, "rather reluctantly," to conclude that handcuffs and leg restraints

were necessary.  (Supp. Tr. 191-92).  While the court acknowledged that Williams' lengthy

record did not include violence in the courtroom and that it could not be sure "beyond a

reasonable doubt" that anything would happen if Williams was not restrained, it emphasized that

it did not "really at this point care to take that chance because I think the people in this

courtroom are potentially in danger . . . ."  (Supp. Tr. 172, 194).  Acknowledging, however, the

potentially prejudicial impact of visible shackles on Williams' due process rights, the court

ordered that both counsel tables be wrapped with skirts to hide the restraints from the jury.

(Supp. Tr. 174).  Further, in response to defense counsel's concern that Williams might not be

able to take notes with his hands cuffed, the court instructed courtroom security to use a waist

chain with leeway for his hands and stated that "I prefer not to do it this way" and "this is not

14

something that I have done lightly or that I wanted to do but I feel that it is absolutely necessary." (Supp. Tr. 192-94).

### D. Trial

Jury selection commenced on June 2, 2008. (Supp. Tr. 251-54). During jury selection, defense counsel noted outside the presence of the panel that some of the prospective jurors had congregated between the defense and prosecution tables and stated that he was "quite certain" they could see the handcuffs and master lock and possibly the chain around Williams' waist. (Supp. Tr. 318). The prosecution responded that "Mr. Williams has the option of pulling his chair in [at] any point and he declines to do that. He sits here with the handcuffs and the shackles visible of his own choice and I don't think he gets to complain if they're visible when he had the option to keep them from the jury's sight." (Supp. Tr. 319). The court remarked that she was not sitting at the proper angle to determine what prospective jurors had seen but agreed that it was up to Williams to "make sure he's sitting there so that the draping, which we went through some trouble to get, does what it's supposed to do . . . ." (Supp. Tr. 319).

From June 5 through June 22, the People presented its case. (Tr. 1-1605). Williams appeared in court on the first day but refused to appear the next day. (Tr. at 225-29). The Court proceeded with trial but instructed the jurors that they should draw no inference from his absence. (Tr. 230). On June 10, after the weekend, Williams appeared again for trial. Before the jury was brought in, defense counsel alerted the court that Williams' hands were cuffed behind his back. The court asked "[i]s there some way we could adjust that?" and the proceedings were paused for adjustment. (Tr. 640). That day, before breaking for lunch, the court again advised Williams of his right to be present but noted that "apparently you didn't want to be here today so I am going to give you the option of leaving if that's what you want to do." (Tr. 677). Williams did not respond but declined to appear for the afternoon session. A

corrections officer informed the court that he had twice asked Williams whether he wanted to come down to trial and got no response either verbally or by action.  (Tr. 678).  The court again instructed the jury that it should draw no inference from Williams' absence.  (Tr. 678).  On June 12, when Williams again refused to appear, the court asked defense counsel if he wanted another "no inference" instruction.  Defense counsel responded "I think we can let it pass by now."  (Tr. 843).  Williams thereafter declined to appear for the remainder of trial.  On each day that Williams was absent, corrections officers explained the efforts they had made to procure him and that Williams had refused to come to court.  (Tr. 902, 1012, 1186, 1188, 1267, 1333-34, 1466-67, 1510, 1644-45, 1704).

The People's case included detailed testimony from the victim and corroborating accounts of Roth, Decamps, Hawthorne, Guellermo, Peroune, Lessard, Billella, Farrell, Fiol, and Bellamore.  (Tr. 386-624, 74-136, 343-82, 641-74, 624-37, 626-37, 955-77, 679-98, 171-269, 1201-66, 1267-1432, 1161-86).  A forensic laboratory technician, who conducted DNA testing on the evidence, testified that the victim's blood had been found on the shirt Williams wore when he was arrested.  (Tr. 1432-66, 1500-45).  Williams was further connected to the attacks by records of phone calls made on the victim's cell phone, bank records reflecting failed withdrawal attempts from the victim's bank accounts, and security camera footage from the grocery stores where those attempts occurred.  (Tr. 844-64, 1014-35, 1035-62, 1134-61, 1598-1605).  Three attending physicians and a member of Harlem Hospital's Emergency Department Sexual Assault Response Team testified regarding the extent and nature of the victim's injuries.  (Tr. 137-70, 1072-99, 1468-1500, 1100-28).  Additional corroborating testimony was received from numerous other New York City detectives, police officers, and firefighters.  (Tr. 270-93, 698-710, 762-843, 865-944, 978-98).  Williams did not testify and called no witnesses in his defense.

(Tr. 1711-13).[3]  On June 24, 2008, after deliberating for less than a day, the jury acquitted

Williams on two counts of first-degree assault and convicted on the remainder of the charges.

(Tr. 1990-98).[4]

On July 24, 2008, Williams refused to appear in court for sentencing and had to be

produced by force.  (Sentencing Transcript ("Sent. Tr.") 20-21).  The court found Williams to be

a second violent offender and sentenced him to an aggregate term of 422 years to life, with

concurrent sentences imposed only to the extent compelled by law.  (Sent. Tr. 26-71, 89-96).

### E.      Direct Appeal

Represented by the Center for Appellate Litigation, Williams filed a timely appeal to the

Appellate Division of the New York Supreme Court, First Department, asserting that: (1) the

trial court's shackling order violated his New York and federal due process rights and Sixth

Amendment right to counsel and participate in his own defense; (2) the convictions for attempted

first-degree murder were not supported by constitutionally sufficient evidence under Jackson v.

Virginia, 443 U.S. 307 (1979); and (3) the conviction for first-degree assault was duplicitous, in

violation of New York law, and unsupported by sufficient evidence of intent to cause serious

physical injury under New York Penal Law § 120.10(1).  (Appendix to Answer, Exhibit A (Brief

for Defendant-Appellant) ("Pet. App. Br.") at 23-28, 29-35, 36-40).

In a published opinion dated November 23, 2010, the Appellate Division affirmed the

convictions in their entirety.  People v. Williams, 78 A.D.3d 574 (1st Dept. 2010).  The

---

[3]      The defense did present three stipulations, none of which are relevant to the issues raised
in the Petition.  (Tr. 1711-13).

[4]      At the conclusion of the prosecution's case, the court dismissed one count of first-degree
criminal sexual act, two counts of first-degree sexual abuse, and 22 counts of predatory sexual
assault.  It also reduced two counts of first-degree sexual assault to attempted assault.  (Tr. 1636-
40, 1699-1703).  Accordingly, 46 counts were submitted to the jury and the jury convicted on 44
of those counts.  (Tr. 1990-98).  At sentencing, the court further dismissed three counts each of
first-degree rape and criminal sexual act as inclusory, concurrent counts.  (Sent. Tr. 25-26).

Appellate Division found that Williams' "conduct, both while at liberty and in custody, and the charged conduct in the present case, were all exceptionally violent," indicating a pattern of violence that continued until shortly before trial.  Id. at 574.  Given this background, the trial court "was not obligated to wait" for Williams to become violent in court before employing restraints.  Id.  Moreover, the trial court appropriately "minimize[d] the prejudicial impact of the restraints" by using table coverings that limited their visibility to the jury.  Id.  The Appellate Division also found the verdict as to each count was supported by legally sufficient evidence and rejected Williams' claim that the indictment for first-degree assault by medication was duplicitous.  Id. at 575.

On November 24, 2010, Williams, again represented by the Center for Appellate Litigation, applied to the New York Court of Appeals for leave to appeal all issues raised before the Appellate Division.  (Appendix to Answer, Exhibit C (Criminal Leave Application)).  The Court of Appeals summarily denied the application on January 28, 2011.  People v. Williams, 942 N.E.2d 1053 (N.Y. 2011).

F.     The Habeas Petition

On March 30, 2011, proceeding pro se, Williams timely petitioned this Court for federal habeas review under 28 U.S.C. § 2254(d).  (Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition" or "Pet.")).[5]  The Petition provides little

---

[5]     According to Williams, the Petition, though not filed on the Court's docket until April 5, 2011, was delivered to prison authorities on March 30, 2011.  (Pet. at 6).  Because Williams is representing himself, he benefits from the "prison mailbox rule," which provides that a petition for writ of habeas corpus is deemed filed on the day it is handed to prison officials for mailing. Houston v. Lack, 487 U.S. 266, 276 (1988).  The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year statute of limitations for federal habeas corpus petitions that begins to run on the date a petitioner's state court conviction becomes final.  28 U.S.C. § 2244(d)(1). "A conviction becomes final for purposes of [section] 2244(d) upon expiration of the ninety-day period to petition for a writ of certiorari to the United States Supreme Court."  Pratt v. Greiner, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002) (citations omitted).  Because Williams' conviction became final on April 28, 2011, his Petition, filed on March 30, 2011, is timely.

detail but appears to assert the same grounds Williams raised on direct appeal, seeking as relief a new trial and/or resentencing on all charges. (Pet. 4, 6). Because Williams has properly exhausted his state court remedies on these claims, jurisdiction is proper and his claims will be reviewed on their merits.[6]

## II.   DISCUSSION

### A.   Standard of Review

Habeas corpus review by a federal court is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, —U.S.—, 131 S. Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may not grant relief unless a state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A federal court applies this standard of review to the last reasoned state court decision to have addressed the petitioner's claims. Brito v. Unger, No. 9:09-cv-0986-JKS, 2011 WL 4736993, at *4 (N.D.N.Y. Oct. 5, 2011) (citing Yist v. Nunnemaker, 501 U.S. 797, 804 (1991)). The state court's determinations of fact "shall be

---

[6]      A habeas petition by a state prisoner may not be granted unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To satisfy the exhaustion requirement, a prisoner must have "fairly presented" both the factual and legal bases of his habeas claims to the highest state court from which a decision can be had. Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001); Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005). Here, the State acknowledges that the Petition "apparently seeks to reiterate the claims [Williams] made on direct appeal in state court," and that Williams sought, but was denied, leave to appeal to the New York Court of Appeals. (Respondent's Memorandum of Law in Support of Answer, filed July 1, 2011 ("Resp. Mem. of Law") at 33 (Dkt. No. 8)). Therefore, Williams has met the exhaustion requirement because Williams has presented his claims to New York State's highest court.

presumed correct [and an] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The phrase "clearly established Federal law" refers to "the holdings as opposed to the dicta," of Supreme Court decisions.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  A decision is "contrary to" such holdings if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or . . . decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Id. at 405-06.  If, however, the state court identifies the correct rule of federal law, the writ should not issue unless the state court unreasonably applied that rule of law to the facts before it.  Yist, 501 U.S. at 804; Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000).  The Supreme Court has repeatedly emphasized that "an unreasonable application of federal law is different from an incorrect application of federal law."  Williams, 529 U.S. at 410 (emphasis in original).  It is "a substantially higher threshold" than determining whether the federal court would have reached a different conclusion were it to apply the applicable rule in the first instance.  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

A federal court may not find the state court decision objectively unreasonable unless "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  Harrington, 131 S. Ct. at 786. "This standard of 'no possibility of disagreement' among 'fairminded jurists' as to the existence of legal error is arguably the narrowest standard of judicial review in the law."  Ayuso v. LaValley, No. 12 Civ. 0932 (BMC), 2012 WL 1194146, at *2 (E.D.N.Y. Apr. 10, 2012).  In applying it, "[t]he more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations."  Renico v. Lett, —U.S.—, 130 S. Ct. 1855, 1864 (2010) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  A federal court "should be particularly deferential . . .

where . . . the state appellate court's assessment of the evidence is intertwined with its interpretation of a complex and evolving body of state law, with which the state courts have far more familiarity than [the federal courts]." Garbutt v. Conway, 668 F.3d 79, 82 (2d Cir. 2012). AEDPA thus establishes "a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Renico, 130 S. Ct. at 1862 (internal citations and punctuation marks omitted) (quoting Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997) and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

### B.    Petitioner's Pro Se Status

Williams bears the burden to establish, by a preponderance of evidence, that his constitutional rights have been violated. Hawkins v. Costello, 460 F.3d 238, 246 (2d Cir. 2006). However, because he is proceeding pro se, Williams' submissions are held to "less stringent standards than formal pleadings drafted by lawyers." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)); see also Seidemann v. Bowen, 584 F.3d 104, 118 (2d Cir. 2009). The Court will liberally construe the pleadings and interpret them "to raise the strongest arguments that they suggest." Diaz v. United States, 517 F.3d 608, 613 (2d Cir. 2008) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Pro se status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotations omitted).[7]

---

[7]    Because the Petition and Williams' Reply only present conclusory arguments on his shackling claim and are silent as to his other claims, I consider the theories he presented on direct appeal and cite to his brief before the First Department. See, e.g., Fayton v. Connolly, No. 06 Civ. 3685 (SAS), 2009 WL 1615995, at *4 (S.D.N.Y. June 9, 2009) (where habeas petition raised broad constitutional claim of ineffective assistance of counsel, only the particular theory raised to the Appellate Division satisfied exhaustion requirement); Fong v. Sears, No. 06-CV-5597 (CBA), 2009 WL 1515743, at *1 (E.D.N.Y. May 29, 2009) (construing bare-bones habeas petition to raise same arguments asserted on appeal).

C.      **The Shackling Order**

Williams first contends that Justice Berkman's shackling order violated his constitutional

rights under Deck v. Missouri, 544 U.S. 622 (2005).  (Pet. at 4; Reply to the Respondent['s]

Opposition [to] Petition for Writ of Habeas Corpus, dated Oct. 2, 2011 ("Reply") at 2 (Dkt. No.

15)).  In Deck, the Supreme Court reaffirmed two long-standing principles of constitutional law.

First, the routine use of visible shackles during the guilt phase of a criminal trial, without a case-

specific inquiry into their necessity, violates a criminal defendant's due process rights by

undermining the presumption of innocence and impairing a defendant's ability to participate

freely in his own defense.  Id. at 626, 630-31.  Second, the Constitution permits the non-routine

use of shackles at a criminal trial "in the presence of a special need."  Id. at 626.  In elaborating

on this concept of "special need," the Deck Court emphasized that it did "not underestimate the

need to restrain dangerous defendants to prevent courtroom attacks or the need to give trial

courts latitude in making individualized security determinations" and was "mindful of the

tragedy that can result if judges are not able to protect themselves and their courtrooms."  Id. at

632; see also Illinois v. Allen, 397 U.S. 337, 343-44 (1970) (affirming trial court's discretion to

use restraints at trial to control abusive or violent defendant).  Thus, rather than establish a

blanket prohibition on the use of visible restraints at trial, Deck holds that restraints are

constitutionally permissible where the trial court determines, "in the exercise of its discretion,

that they are justified by a state interest specific to a particular trial."  Deck, 544 U.S. at 629; see

also DeLeon v. Strack, 234 F.3d 84, 88 (2d Cir. 2000) (approving the use of restraints at trial

when the trial court "independently exercises its discretion in ordering the restraints to maintain

safety and security, imposes no greater restraints than are necessary and takes steps to minimize

the prejudice flowing from the restraints").

Consistent with Deck, the trial court in this case conducted a case-specific inquiry into the existence of a "special need" for the use of restraints at Williams' trial.  The court took note of Williams' incarceration record, which was rife with violent attacks on corrections officers and other prisoners, as well as sexually inappropriate behavior.  The court considered that Williams was charged with more than 40 counts of rape, assault, and attempted murder in which he was alleged to have used a knife, scissors, bleach, boiling water, heavy objects, over-the-counter medication, and fire as deadly weapons.  The court also noted that a razor blade had been discovered in Williams' rectum while in custody on the charges and that Williams' conduct with respect to the proceedings before it, while not violent, had been frequently disruptive.  Based on this information, the trial court reasonably concluded that Williams was "interested in derailing this trial by way of any means necessary" (Supp. Tr. 191) and that restraints were necessary to protect the security of the courtroom during the trial.

Williams argues that the shackling order was unconstitutional because the record before the trial court did not include violence in a courtroom.  (Pet. App. Br. at 23, 25-26).  However, Deck did not condition a trial court's use of shackles on a showing that a defendant has previously been violent in the courtroom.  Nor did it otherwise adopt any particular limiting principle on a trial court's case-specific discretion to determine that restraints are necessary. Deck, 544 U.S. at 632; see also Jenner v. Brown, No. 9:07-cv-10301-JKS, 2010 WL 1423944, at *9 (N.D.N.Y. Apr. 9, 2010) (noting that "[t]he Supreme Court has yet to define the parameters of what constitutes 'adequate justification' for the use of restraints").  Instead, Deck acknowledged that a trial court's case-specific "determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."  Deck, 544 U.S. at 629; see also Brown v. Doe, 2 F.3d 1236, 1247 (2d Cir. 1993) (stating that "[t]he security measures taken at a state courthouse are . . . peculiarly within the

23

purview and discretion of the state judiciary") (quoting <u>Holbrook v. Flynn</u>, 475 U.S. 560, 572 (1986)).

The record on which Justice Berkman based her shackling order is precisely the sort of information that courts have traditionally relied upon in concluding that a criminal defendant poses a threat to courtroom security sufficient to overcome <u>Deck</u>'s presumption against restraints.  <u>See</u>, <u>e.g.</u>, <u>Strack</u>, 234 F.3d at 88 (approving use of shackles where defendant allegedly punched, kicked, and slashed his wife with a razor and made implied threats toward the court); <u>Rush v. Lempke</u>, No. 09-CV-3464 (JFB), 2011 WL 477807, at *11-12 (E.D.N.Y. Feb. 2, 2011) (finding use of leg shackles at trial not abuse of discretion where petitioner allegedly threatened to kill a corrections staff member); <u>Jenner</u>, 2010 WL 1423944, at *8-9 (finding shackling order reasonable under <u>Deck</u> where grounded on, among other factors, defendant's criminal history, serious nature of the pending charges, and trial court's finding that defendant "was willing to risk anything, even his own personal safety, to further his goals"); <u>Jacobs v. West</u>, No. 03-CV-6586, 2009 WL 2378673, at *12 (W.D.N.Y. Aug. 3, 2009) (finding adequate justification for shackling order due to defendant's  outburst in court, threats to "throw piss" at nurse, attempts to stab correctional officer with pen, and voiced concern of relative that defendant might act out violently in the courtroom); <u>United States v. Davis</u>, 548 F. Supp. 2d 96, 101 (S.D.N.Y. 2008) (issuing shackling order based on extreme violence of the charges, allegations of threats to witnesses, other conduct suggesting predisposition to violence, and defendant's refusal to attend court voluntarily for pretrial proceedings).[8]

---

[8]     Williams cites <u>Lewis v. Marshall</u>, 612 F. Supp. 2d 185 (N.D.N.Y. 2009) in support of his argument that the shackling order violated <u>Deck</u>.  (Reply at 2).  In <u>Lewis</u>, the district court acknowledged that a trial court may properly conclude that "visible shackles are justified in the specific instance because of, <u>inter alia</u>, potential security problems."  612 F. Supp. 2d at 198. The <u>Lewis</u> court, however, could not find any indication in the record that the trial court had made a case-specific determination regarding the need for restraints.  <u>Id.</u> at 198-99 (explaining that "[t]he trial court in this case <u>may</u> have conducted the required analysis and made the decision to permit the shackling justified by a state interest specific to Petitioner's particular trial.

Moreover, as the Appellate Division noted, the trial court appropriately "minimized the prejudicial impact of the restraints by directing the use of coverings that limited their visibility to the jury." Williams, 78 A.D.3d at 574. Given these efforts, and that Williams did not testify or otherwise have reason to expose the shackles to the jury, it is unclear that Deck, which by its terms only applies to visible shackles, controls here. See Deck, 544 U.S. at 632 (prohibiting only routine use of "visible" restraints based on prejudicial effect); see also U.S. v. Harper, 421 Fed. App'x. 108, 113 (2d Cir. 2011) ("Even assuming arguendo that it was error to restrain Harper, we conclude that the error was harmless in light of the measures taken [to hide the restraints from the jury] . . . .'") (citing Hameed v. Mann, 57 F.3d 217, 222 (2d Cir. 1995)); Strack, 234 F.3d at 88 ("[I]t is not clear that . . . an independent exercise of discretion is even required when restraints will not be visible to the jury."); United States v. Bin Laden, No. S7R 98 Cr. 1023 (KTD), 2005 WL 287404, at *3-4 (S.D.N.Y. Feb. 7, 2005) (holding that defendant's constitutional rights were not violated when trial court placed apron around defense table and took other precautions to keep restraints hidden from jury). The record also suggests that despite the trial court's efforts to hide the restraints from the jury, Williams voluntarily exposed them to prospective jurors during voir dire. (Supp. Tr. 318-19, Pet. App. Br. at 22-23). Thus, any prejudicial impact resulting from the use of restraints is properly attributable to Williams, not the State. See DeLeon, 234 F.3d at 88 ("[A]ny prejudice that resulted from the handcuffs was caused by [petitioner's] own action in calling the jury's attention to them.").

To the extent Williams argues that the shackling order undermined his Sixth Amendment right to attend trial (Pet. App. Br. at 28), the record refutes any contention that Williams' absences at trial are attributable to the shackling order. Even before the trial court issued the order, Williams frequently absented himself from court and manifested ambivalence about

---

However, the record's silence in this case indicates otherwise . . . .") (citing Deck, 544 U.S. at 629) (emphasis added). Here, Justice Berkman made ample case-specific findings and therefore satisfied the essential requirement the court in Lewis found to be lacking.

attending the proceedings.  (Supp. Tr. 174-87).  The court repeatedly advised Williams that he

had an absolute right to attend his trial and continuously sought to confirm that his frequent

absences were voluntary.  (Supp. Tr. 187; Tr. 225, 229, 536, 677-78, 843-44, 1012, 1186, 1333-

34, 1466-1467).  Williams never claimed that his restraints were too tight or were interfering

with his ability to attend trial.  Indeed, after the sole instance in which Williams' attorney did

object to the configuration of the restraints because Williams' hands were cuffed behind his

back, the court promptly requested that the cuffs be adjusted.  (Tr. 640).  Thus, the record

indicates that Williams' absences at trial were completely voluntary and had little, if anything, to

do with the shackling order.

Finally, even had the shackling order caused discernible prejudice and not been justified

under Deck, the record leaves no reasonable doubt that it did not affect the jury's verdict.  See

Deck, 544 U.S. at 635 (holding that even if a trial court orders visible shackles without adequate

justification, relief is not warranted if the State proves "beyond a reasonable doubt that the

shackling error complained of did not contribute to the verdict obtained") (quoting Chapman v.

California, 386 U.S. 18, 24 (1967)).  Here, the victim's testimony was detailed, consistent, and

corroborated by multiple witnesses and a mountain of painstakingly collected forensic evidence.

The strength of this evidence is evident in defense counsel's apparently strategic decision not to

cross examine several of the witnesses, including the victim, and in the extremely short amount

of time (one day) that the jury deliberated before delivering its verdict.  Nevertheless, during its

deliberation, the jury requested to view exhibits, obtained readback of the testimony, and sought

clarification from the court on jury instructions.  (Tr. 1970, 1977, 1984-85).  It also ultimately

acquitted Williams on two counts.  (Tr. 1992).  These facts suggest that the jury neutrally applied

the evidence to the charges and did not reflexively render a verdict based on prejudice.  On this

record, the State easily meets its burden to show that Williams' shackles did not contribute to the

verdicts obtained.  See, e.g., Rush, 2011 WL 477807, at *13 (reasoning that even had "the trial judge abused his discretion in determining that shackles were necessary . . . any errors were harmless because the evidence of petitioner's guilt is overwhelming and thus any allegedly prejudicial effect of the shackles would have been outweighed by the evidence of his guilt") (citing Hameed, 57 F.3d at 224).

In sum, the Appellate Division reasonably applied Deck in concluding that the shackling order did not violate Williams' constitutional rights.  Accordingly, I recommend that Williams' challenge on this ground be rejected.

### D.       The Attempted First-Degree Murder Convictions

Williams next contends that the evidence was legally insufficient for the jury to convict for attempted first-degree murder under the "witness-elimination" and "torture-murder" theories presented by the prosecution.  Under Jackson v. Virginia, 443 U.S. 307 (1979), a state prisoner is entitled to relief if a habeas court finds that the evidence adduced at the trial was constitutionally insufficient to establish proof of his guilt beyond a reasonable doubt.  Id. at 321; see also In re Winship, 397 U.S. 358, 364 (1970).  However, Williams bears a "very heavy burden" to obtain relief on such grounds.  Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).  In viewing a constitutional sufficiency claim, federal habeas "judges must be highly deferential to the jury's verdict of conviction" and should "uphold the jury's verdict unless the evidence that the defendant committed the crime alleged is nonexistent or so meager" as to compel the conclusion that the jury's finding of one or more necessary elements was based on "pure conjecture." Langston v. Smith, 630 F.3d 310, 314, 319 (2d Cir.), cert. denied, —U.S.—, 132 S. Ct. 366 (2011).  "Further, since Jackson calls for the application of a 'general standard,' the state court [decision] is entitled to additional 'leeway.'"  Id. at 320 (quoting Yarborough, 541 U.S. at 664). Federal habeas review thus preserves "full play to the responsibility of the trier of fact fairly to

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  In addition, because the Appellate Division found the evidence legally sufficient, "double deference" is due to its decision such that the writ may not be granted unless "no reasonable court could have held that any reasonable jury could have read the evidence to establish [P]etitioner's guilt beyond a reasonable doubt." Garbutt, 668 F.3d at 81-82 (emphasis in original).

> 1.     The Conviction for Attempted Witness-Elimination Murder

Count two of the indictment charged, and Williams was convicted of, attempted "witness-elimination murder" under New York Penal Law § 125.27(1)(a)(v) (the "witness-elimination statute").  This offense required the State to establish that "the intended victim was a witness to a crime committed on a prior occasion" and that the attempted murder was "for the purpose of preventing the intended victim's testimony in any criminal action or proceeding whether or not such action or proceeding had been commenced . . . ."  P.L. § 125.27(1)(a)(v). The latter element is satisfied if a defendant's motivation to eliminate a victim as a witness is a "substantial factor" in the murder, even if the defendant may have had mixed motives.  People v. Cahill, 2 N.Y.3d 14, 57 (2003).  A victim of attempted witness-elimination murder may also be the victim of the prior (witnessed) crime.  See id. at 56-62.

On appeal, Williams acknowledged that the Penal Law does not define the term "prior occasion" or "otherwise specify any degree of temporal or spatial separation between the prior occasion and the attempted homicidal act" but nevertheless contended that the evidence at trial was insufficient to establish the "prior occasion" element as a matter of law.  (Pet. App. Br. at 30-32).  Williams relied on People v. McIntosh, 53 A.D.3d 1, 4 (1st Dept. 2008) and People v. Adamson, 47 A.D.3d 318 (3d Dept. 2007) to argue that, because his crimes constituted a continuous, primarily unbroken chain of events in a single location, and only a few hours

28

separated the last physical assault from the attempted murder by arson, the earlier sexual crimes could not be considered crimes "on a prior occasion" within the meaning of the Penal Law.  (Pet. App. Br. at 30-32).  The Appellate Division rejected this argument, reasoning that "[w]hile defendant restrained, and periodically abused, the victim over a period of 19 hours at a single location, the jury could have reasonably concluded that this period had several distinct phases or stages, and that at least by the final stage defendant had formed an intent to kill the victim in order to prevent her from reporting the crimes he committed at the earlier stages." Williams, 78 A.D.3d at 575.

As a threshold matter, as the State observes, Williams' argument is more aptly characterized as an issue of statutory interpretation rather than evidentiary sufficiency.  (Resp. Mem. of Law at 45).  Whereas evidentiary sufficiency claims are concerned with ensuring that "the government's burden of proof has [not] been impermissibly reallocated or reduced," Ponnapula, 297 F.3d at 182, Williams has barely discussed the State's burden, the quantum of evidence introduced at trial, or the proper inferences that can be derived therefrom.  Instead, Williams has discussed the legislative history of the witness-elimination statute and the circumstances it was intended to deter, and compared the distinct temporal and geographical circumstances that led the McIntosh and Adamson courts to arrive at different conclusions with regard to whether the "prior occasion" element could be met as a matter of law.  (Pet. App. Br. 30-32).  In short, the thrust of Williams' argument is that the term "prior occasion" does not, as a matter of law, encompass the circumstances of his case.

To the extent this is so, federal habeas relief is not available.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state court determinations on state law questions.").  The conduct that will satisfy "the elements of a state crime is a question generally answerable only by the state legislature and state courts and is

antecedent to the constitutional requirement that the government prove those elements beyond a reasonable doubt." Ponnapula, 297 F.3d at 182 (quoting Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)) (internal citation and quotation omitted); see also Patterson v. New York, 432 U.S. 197, 211 n.12 (1977) ("The applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case . . . ."). Thus, to the extent the Appellate Division's decision reflects on the proper scope of the term "prior occasion" under the Penal Law, this Court is bound by that interpretation. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").[9]

Here, the Appellate Division intimated that the "prior occasion" element may be satisfied by distinct "phases or stages" of an unbroken series of crimes marked, at least in part, by a later formation of the intent to kill for the purpose of preventing witness testimony over an earlier phase. Williams, 78 A.D.3d at 575; see also McIntosh, 53 A.D.3d at 5-6 (describing the proper inquiry as whether "the sexual attacks and the attempted murder were separated by a prolonged break in time, a change of localities and the formation of distinct criminal intentions"); People v. Hopkins, 95 A.D.2d 870, 870 (3d Dept. 1983) (concluding that rape was not part of same criminal transaction as subsequent attempted murder of same victim in part because intent to kill was not formed at time of rape). Because the Court of Appeals declined to hear Williams' appeal, this Court is "left only with the state intermediate court's interpretation of the terms in

---

[9]      Petitioner has not argued that the New York courts' interpretation of the scope of the witness-elimination statute violates the right to fair notice under the Due Process clause. See Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 157-59 (2d Cir. 2009) (explaining contours of fair notice claim). Because that claim has not been fairly presented either here or to the state courts, it is not considered here. See Baldwin v. Reese, 541 U.S. 27, 32 (2004) (holding that, ordinarily, a state prisoner does not "fairly present" a federal claim to a state court if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such federal claim).

the state statute and . . . bound by that interpretation in [its] review of a defendant's [sufficiency] claim." Ponnapula, 297 F.3d at 183.  Thus, this Court's review is limited to "whether the elements so defined [by the Appellate Division] have been proven beyond a reasonable doubt." Id.

The evidence at trial established that Williams repeatedly raped and sexually assaulted the victim late into the evening of Friday April 13th and pre-dawn hours of Saturday April 14th but did not set fire to the victim's apartment until shortly before 5 p.m. on April 14th.  (Tr. 417-84, 682, 701).  In the interim, Williams asked the victim a series of questions about whether she was running from the law, whether she had ever testified against anyone, and whether she could be trusted to take Williams to her car in Connecticut.  (Tr. 470-74, 520-21).  He also ate a meal, searched through the victim's apartment, rifled through her cleaning supplies, made two trips to nearby ATM machines, assaulted the victim in multiple ways, and moved the bound and gagged victim repeatedly in and out of her closet in apparent indecision about what to do with her.  (Tr. 453-70, 496-553).  These activities temporally and conceptually separated the initial sexual attacks from the final homicidal act.  In addition, the jury could have inferred from Williams' three separate attacks on the victim's eyes, and his subsequent questions regarding her eyesight, that Williams initially meant only to eliminate the victim's ability to identify him and did not form the concrete intent to kill until shortly before he set her apartment on fire.  Thus, there was ample evidence for the jury to find that the multiple rapes and sexual assaults Williams committed on Friday night formed an earlier phase of his 19-hour attack that was separate and distinct from his final attempts to eliminate the victim as a witness on Saturday afternoon.

Williams also has argued that his conviction for attempted torture-murder under Penal Law § 125.27(1)(a)(x) (the "torture-murder statute") required the jury to find that his physical assaults formed a "course of conduct" that was a "material element" of the attempted torture-

murder count, "compelling the conclusion that the attempted homicide itself . . . was integral to, not a separate occasion from, the entirety of events that took place in the apartment." (Pet. App. Br. at 33). This argument also raises a question of state law—namely, the temporal relationship between the "course of conduct" and homicidal act under the torture-murder statute, and scope of the term "prior occasion" under the witness-elimination statute. To that extent, it is not a proper basis of federal habeas review, as discussed. Moreover, the jury could have found that any one or all of the early sexual attacks were the relevant crime(s) on a "prior occasion" under the witness-elimination statute but that the "course of conduct" under the torture-murder statute consisted of throwing bleach in the victim's face, hitting her with a heavy object, force-feeding her medication, threatening to gouge her eyes out, slashing at her eyes with a knife, and scalding her with boiling water, each of which was subsequent to, and distinct from, the early sexual attacks. Thus, a reasonable jury could have found, without any logical inconsistency, that the "prior occasion" element of witness-elimination murder was satisfied by Williams' sex crimes and the "course of conduct" element of torture-murder was satisfied by the later assaults. Accordingly, I recommend that Williams' claim on this basis be denied.

### 2.   The Conviction for Attempted Torture-Murder

Williams also challenges the sufficiency of the evidence underlying his conviction for attempted torture-murder. For this charge, the State was required to prove that Williams attempted to murder the victim and that he acted in an "especially cruel and wanton manner pursuant to a course of conduct intending to inflict and inflicting torture upon the victim prior to the [attempted] death." P.L. § 125.27(1)(a)(x). "Torture" is defined as "the intentional and depraved infliction of extreme physical pain." Id. "Depraved" means that "the defendant relished the infliction of extreme physical pain upon the victim evidencing debasement or

perversion or that the defendant evidenced a sense of pleasure in the infliction of extreme

physical pain." (Id.).

Williams claims that there was insufficient evidence to establish that he "relished" or

took pleasure in inflicting severe pain on the victim. (Pet. App. Br. at 34-36). He argues that his

various physical assaults on the victim were initially precipitated by the victim's attempt to stab

him with scissors and that his subsequent attacks "had their genesis in frustration and fury" after

his repeated inability to access money from the ATM. Williams asserts that, because the assaults

were unaccompanied by any "laughter, smiling, or mocking" or other manifestation of pleasure,

and because they were motivated by anger and the "rational" purpose of preventing the victim

from later identifying him, the jury could not reasonably have found that he "relished" or took

pleasure in inflicting pain on the victim. Id.

However, New York law does not require that an act of torture be accompanied by

laughter, smiling, or mocking in order to satisfy the requirement that a defendant "relished" or

took pleasure in inflicting pain. In fact, New York courts have frequently recognized that intent

may be inferred from a defendant's conduct and the surrounding circumstances. See, e.g.,

United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002) (citing cases); People v. Smith, 79

N.Y.2d 309, 315 (1992). This Court must "credit every inference that could have been drawn in

the State's favor, whether the evidence being reviewed is direct or circumstantial." Reddy v.

Coombe, 846 F.2d 866, 869 (2d Cir. 1988) (internal citations omitted). Consistent with this

general principle, federal and state courts have frequently found similar "relish" or "pleasure"

requirements met in the absence of any smiling, laughing, or other explicit manifestation of

enjoyment. See e.g., Lewis v. Jeffers, 497 U.S. 764, 783-84 (1990) (applying Jackson to find

sufficient evidence that defendant "relished" killing based on manner in which defendant

inflicted multiple blows on his already-dead victim while calling her names); State v. Greenway,

33

170 Ariz. 155, 166-67 (1991) (bragging and nonchalance toward killings indicated that defendant "relished" them);  State v. Walton, 159 Ariz. 571, 587 (1989) (defendant's indifference to suffering and comment that he "had never seen a man pee in his pants before" was evidence of pleasure in killing).

Here, the jury could have inferred that Williams relished inflicting pain on the victim from his sadistic and prolonged dealings with her, which included blindfolding the victim, hanging her naked in a closet, spreading superglue on her lips, and demanding that she gouge her own eyes out with scissors.  These acts cruelly tormented the victim and were wholly unnecessary to Williams' purported retributive purpose or the goal of preventing the victim from reporting him to the authorities.  The jury also could have found that Williams relished the infliction of extreme pain simply from the bizarre and needlessly brutal techniques he selected for assaulting the victim, which included throwing boiling water on her, slashing at her eyes with a kitchen knife, throwing bleach in her face, force-feeding her medication, and setting her apartment on fire, not all at once, but in a drawn-out manner over many hours.  In addition, the jury could have found that Williams took pleasure in the victim's torment from his remarks to the victim that she was "not good enough" for a quick death, as she implored (Tr. 530), and his final leering statement to the victim, "You wanted to die, right?"  (Tr. 553).

While the conclusion that Williams assaulted the victim for rational or retributive purposes, as Williams has argued, may be a reasonable interpretation of the evidence, it does not preclude other reasonable interpretations, which this Court must credit.  Reddy, 846 F.2d at 869.  Moreover, even if the jury agreed with Williams that the assaults were partially motivated by fury and/or the "rational" goal of preventing the victim from later identifying him, it would not preclude a finding that Williams also relished inflicting extreme pain on the victim, of which there was substantial evidence.  Thus, I find that there was ample circumstantial evidence from

which to conclude that Williams "relished" inflicting pain on the victim and that the Appellate Division reasonably affirmed the jury's conviction on this charge. Accordingly, I recommend that Petitioner's constitutional sufficiency claim on this ground be denied.

### E.      The Conviction for Assault by Force-Fed Medication

Last, Williams challenges his conviction for first-degree assault based on his use of non-prescription medication as a dangerous instrument. On this count, the State was required to prove that Williams intentionally used non-prescription pills as a "deadly weapon or dangerous instrument" to inflict serious physical injury on the victim. P.L. § 160.10(1). Williams argues that the indictment on this count was duplicitous and that the conviction was not supported by legally sufficient evidence of intent to cause serious bodily harm. (Pet. App. Br. 37-40). I address both arguments in turn.

#### 1.      Duplicity

Williams claims that the assault by medication charge was duplicitous because it charged four distinct criminal acts—namely, four separate incidents in which Williams forced the victim to ingest non-prescription drugs—as a single count of assault. (Pet. App. Br. 37-38). On appeal, Williams grounded his duplicity challenge primarily in the state law requirement that "[e]ach count of an indictment may charge one offense only." (Id. at 37 (citing C.P.L. § 200.30(1)). This state law claim is not cognizable under AEDPA. See Estelle, 502 U.S. at 67-68. However, Williams also argues that, by charging multiple acts in a single count, the indictment violated his federal constitutional rights to fair notice of the charges, a unanimous verdict, and double-jeopardy protection. (Pet. App. Br. at 38). Though Williams cites no law to support this claim, federal courts, including the Second Circuit, have found, at least as a matter of federal pleading, that a duplicitous indictment may impair a defendant's federal "rights to notice of the charges against him, to a unanimous verdict, to appropriate sentencing and to protection against double

jeopardy in a subsequent prosecution." <u>See</u>, <u>e.g.</u>, <u>United States v. Crisci</u>, 273 F.3d 235, 238 (2d Cir. 2001) (quoting <u>United States v. Murray</u>, 618 F.2d 892, 896 (2d Cir. 1990)). "The rule against duplicity prohibits the Government from joining two or more distinct offenses in a single count, because if a jury were to return a general verdict on a duplicitous count, it would be unclear as to whether the defendant was found guilty of only one crime and not the other, or guilty of both." <u>United States v. Coffey</u>, 361 F. Supp. 2d 102, 109 (E.D.N.Y. 2005) (citing <u>Murray</u>, 618 F.2d at 896); <u>see also</u> <u>United States v. Sturdivant</u>, 244 F.3d 71, 75 n.3 (2d Cir. 2001) (explaining that an indictment is duplicitous "if it joins two or more distinct crimes in a single count"). However, an "indictment is not [duplicitous] if it alleges in a single count . . . the commission of a crime by several means." <u>Crisci</u>, 273 F.3d at 238-39 (citation omitted). Nor is an indictment duplicitous where acts that could be charged as separate counts are, instead, charged as a single count if those acts can fairly be characterized as part of a single continuing scheme. <u>United States v. Olmeda</u>, 461 F.3d 271, 281 (2d Cir. 2006) (quoting <u>United States v. Tutino</u>, 883 F.2d 1125, 1141 (2d Cir. 1989)). Thus, the Second Circuit repeatedly has distinguished between "improperly charging separate offenses in one count and properly charging separate means of committing a single crime in a single count." <u>Crisci</u>, 273 F.3d at 238.[10]

In applying these principles to the instant case, I note first that the Second Circuit's rule against duplicitous pleading is not a basis for habeas corpus relief under 28 U.S.C. § 2254 unless it reflects clearly established Supreme Court law that is binding upon the states. Williams has cited, and I have found, no Supreme Court decision clearly prohibiting a duplicitous indictment as a matter of federal constitutional law. However, I need not consider that issue because I find

---

[10]     The Second Circuit has also been clear that duplicitous pleading "is not presumptively invalid," <u>Olmeda</u>, 461 F.3d at 281, but is impermissible only if the defendant demonstrates prejudice because "the doctrine is more than an exercise in mere formalism." <u>Sturdivant</u>, 244 F.3d at 75 (quoting <u>Murray</u>, 618 F.2d at 896). I decline to address prejudice here because I find the rule inapplicable in the first instance.

that the indictment for assault by medication was not duplicitous even under the Second Circuit's rule.  The State charged Williams with one count of first-degree assault based on four forced drug ingestions over the course of several hours that collectively caused the victim to suffer near liver failure.  (Tr. 1982-83).  These several forced administrations of Tylenol were charged as a singular use of "medication as a dangerous instrument," and hence a singular assault, under Penal Law § 200.30(1).  (Tr. at 1982-83).  Although each administration of Tylenol may have been distinct in time (Pet. App. Br. at 38), the State's theory, which the evidence supported, was that the overall damage to the victim's liver from these several administrations was cumulative and indivisible and constituted a single crime.  (Tr. 154-58).  It is beyond dispute that this manner of charging is permissible as a matter of both Second Circuit and clearly established Supreme Court law.  See, e.g., Schad v. Arizona, 501 U.S. 624, 631 (1991) ("[I]t may be alleged in a single count that . . . the defendant committed [the offense] by one or more specified means.") (quoting Fed. R. Crim. P. 7(c)(1)); United States v. Miller, 471 U.S. 130, 136 (1985) ("This Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways.") (collecting cases) (emphasis added); see also Cramer v. United States, 325 U.S. 1, 35 n.43 (1945) ("[T]he Constitution does not require [a crime] to be proved by any single . . . act.  It may be grounded upon any number [of acts] . . . . We speak in the singular but what we say applies as well to a series of acts or to the sum of many acts."); Crisci, 273 F.3d at 238 (charging separate means of committing a single crime in a single count is proper, not duplicitous).

    Williams' claim also raises the issue of whether the indictment on this count provided him with constitutionally sufficient notice of the charge under the Sixth Amendment.  See e.g., Timmons v. Lee, No. 10-CV-1155 (JG), 2010 WL 3813963, at *10 (E.D.N.Y. Sept. 23, 2010) ("Implicit in [petitioner's] duplicity argument . . . is the constitutional claim that the 'multiple

theoried indictment' violated his Sixth Amendment right to be informed of the nature and cause of the accusation against him."); United States v. Gonzalez, No. 08 Cr. 363 (BSJ), 2010 WL 1924703, at *10 (S.D.N.Y. May 12, 2010) (considering duplicity argument in terms of whether indictment provided fair notice of charges under Sixth Amendment).  To provide constitutionally sufficient notice under the Sixth Amendment, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  Gonzalez, 2010 WL 1924703, at *10 (citing United States v. Stavroulakis, 952 F.2d 686, 963 (2d Cir. 1992)).  "Stated otherwise, the Constitution requires only that an indictment contain the elements of the offense in sufficient detail to fairly inform the defendant of the charges he must meet and to enable him to plead double jeopardy."  Id. (citing United States v. Resendiz-Ponce, 549 U.S. 108 (2007)).

In Williams' case, the indictment charged that each administration of non-prescription medication took place in the victim's apartment during a finite period that lasted approximately 19 hours.  Williams was therefore informed of the conduct forming the basis of the charge and the time frame in which it occurred with sufficient specificity to defend against the charges and raise double jeopardy in the future.  This is all that the Sixth Amendment requires.  Gonzalez, 2010 WL 1924703 at *10.[11]  Accordingly, I find that the Appellate Division reasonably applied Federal law in rejecting Williams' duplicity challenge on this basis.

---

[11]     Petitioner also asserts that the indictment offended his constitutional right to a unanimous jury verdict.  (Pet. App. Br. at 38).  However, the Constitution does not require the jury to have agreed unanimously on the precise administration(s) that caused the victim's injury.  See, e.g., United States v. Stewart, 433 F.3d 273, 319 (2d Cir. 2006) ("[W]here a single count alleges that the defendant committed a charged offense by one or more specified means, we have never suggested that the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.") (quoting Schad, 501 U.S. at 631 (internal punctuation marks omitted)).

2.      Sufficiency of the Evidence

Finally, Williams argues that there was insufficient evidence at trial to establish the intent element of first-degree assault.  (Pet. App. Br. 39-40).  In particular, Williams has asserted that intent to cause serious physical injury may not logically be inferred from his use of Tylenol (as opposed to a more dangerous drug, such as prescription painkillers or narcotics) because the dangerousness of over-the-counter drugs is not a matter of common knowledge.  (Id. at 40). Williams reasons that, because the State relied upon the expert testimony of Dr. Kristine Burkhardt to explain, in highly technical terms, how excessive quantities of Tylenol result in "hepatic necrosis," it could not be assumed from the evidence that a mere "lay" person" like Williams would have known about or intended the liver injury that in fact resulted.  (Id. at 39-40).

However, Williams need not have understood the precise physiological mechanism by which excessive quantities of Tylenol in the victim's blood caused injury to her liver (what Dr. Burkhardt referred to as "hepatic necrosis or liver cell . . . death" (Tr. 156-57)) to know that excessive quantities of Tylenol would or could make the victim very sick.  The jury could reasonably have concluded that the dangers of consuming excessive quantities of over-the-counter medication are a matter of common knowledge.  In reaching this conclusion, the jury could have relied on the highly regulated nature of over-the-counter drugs, the labels on the back of Tylenol bottles establishing maximum dosage guidelines, and a common sense understanding of the dangers of any drug in gross excess.  The jury could also have inferred intent to cause serious bodily injury from Williams' many other assaults on the victim, which established an overarching intent to seriously harm the victim in a multitude of ways.  Therefore, I conclude that the Appellate Division did not err in finding that the evidence was constitutionally sufficient to support a conviction for first-degree assault by medication.

### III.   CONCLUSION

For the foregoing reasons, I recommend that the Petition be denied in its entirety.

Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28

U.S.C. § 2253(c)(1)(A), because Williams has not "made a substantial showing of the denial of a

constitutional right."  Id. at § 2253(c)(2).

### PROCEDURE FOR FILING OBJECTIONS<br>TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Paul G. Gardephe, United States Courthouse, 500 Pearl Street, Room 2260, New York, New

York, 10007, and to the undersigned.  Any requests for an extension of time for filing objections

must be directed to Judge Gardephe.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN

(14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW.  See Thomas v. Am, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund

v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.

1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.

1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72.

If Williams does not have access to cases cited herein that are reported on

LEXIS/WESTLAW, he should request copies from Respondent's counsel.  See Lebron v.

Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (noting that the Court may ask opposing counsel to

provide, to a pro se litigant, copies of decisions that are available electronically).

Dated: New York, New York
      June 1, 2012

                                      JAMES L. COTT
                                      United States Magistrate Judge

**A copy of this Report and Recommendation is being sent by ECF to counsel and by mail to:**

Robert Williams
08-A-4386
Five Points Correctional Facility
P.O. Box 119
Romulus, N.Y. 14541